## UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI

IN RE:

| | |
|---|---|
| **WALTER W. HEIGLE III,** | **CASE NO. 07-02012-NPO** |
| **DEBTOR.** | **CHAPTER 11** |

| | |
|---|---|
| **BAYOU LOUIE FARM, INC., ET AL.** | **PLAINTIFFS/COUNTER-DEFENDANTS** |
| **VS.** | **ADV. PROC. NO.  08-00060-NPO** |
| **JERRY D. WHITE** | **DEFENDANT/ THIRD-PARTY PLAINTIFF/COUNTER-CLAIMANT** |
| **VS.** | |
| **WALTER W. HEIGLE III, ET AL.** | **THIRD-PARTY DEFENDANTS** |

### MEMORANDUM OPINION AND ORDER
### GRANTING AMENDED COMPLAINT IN PART;
### DENYING COUNTERCLAIM/THIRD-PARTY COMPLAINT,
### MOTION FOR SUMMARY JUDGMENT AND MOTION TO STRIKE;
### AND RESOLVING RIGHT TO PROCEEDS FROM WINTER WHEAT CROP

There came on for trial (the "Trial") the Amended Complaint for Specific Performance and

Other Relief ("Amended Complaint") (Adv. Dk. No. 103)[1] filed by Bayou Louie Farm, Inc. ("Bayou

Louie")[2], Arkla Miss Farms Partnership, a Mississippi Partnership ("Arkla Miss"), and Heigle

(collectively, the "Plaintiffs"); the First Amending (sic) and Supplemental Complaint

("Counterclaim/Third-Party Complaint") (Adv. Dk. No. 12) filed by Jerry D. White ("White"); and,

---

[1]*See* Discussion Section 1 for a more complete analysis of the pleadings tried.

[2]The shareholders of Bayou Louie are Tom Swarek ("Swarek"), a businessman and real estate entrepreneur, and Rebecca Heigle, wife of Walter W. Heigle III ("Heigle").  Heigle serves as President of Bayou Louie.

the answers thereto filed by Jimmy Sanders, Inc. ("Sanders") (Adv. Dk. No. 35), Focus Bank ("Focus Bank") (Adv. Dk. No. 36),[3] Bayou Louie (Adv. Dk. No. 38), and Arkla Miss (Adv. Dk. No. 39) in the above-styled adversary proceeding (the "Adversary").   At the Trial, the parties also argued Defendant's Motion for Summary Judgment ("Motion for Summary Judgment") (Adv. Dk. No. 148); Plaintiffs' Response to Defendant's Motion for Summary Judgment (Adv. Dk. No. 184); Defendant's Motion to Strike Claims and Defenses of Bayou Louie Farm, Inc., Enter Default Judgment Against Bayou Louie Farm, Inc. and Award All Appropriate Sanctions for Manufacturing False Evidence, Suborning Perjury and Other Unprofessional Conduct ("Motion to Strike") (Adv. Dk. No. 150); and, Plaintiffs' Response thereto (Adv. Dk. No. 185).   At the Trial, Charles W. Pickering, Sr., Alan L. Smith, and Eddie J. Abdeen represented the Plaintiffs; Sedric E. Banks and Eileen N. Shaffer represented White; Chad J. Hammons represented Sanders; and C. Phillip Buffington, Jr. represented Focus Bank.[4]

The Court, having considered the pleadings and briefs, as well as the testimony, exhibits, and arguments of counsel presented at Trial, finds that the Amended Complaint is well taken in part and should be granted as set forth herein; the Counterclaim/Third-Party Complaint, the Motion for Summary Judgment, and Motion to Strike are not well taken and should be denied; and, the rights to the proceeds from the Winter Wheat Crop should be resolved in favor of Focus Bank.

---

[3]*See infra* note 8.

[4]The Motion to Authorize Trustee to Pay Claims ("Sciara's Motion") (07-02012, Dk. No. 452) filed by Carlo Sciara, Jr. ("Sciara") was set for hearing at the same time as the Trial.  James W. Berry represented Sciara.  After testimony and argument by counsel, the parties resolved Sciara's Motion, and the Court entered an order granting Sciara's Motion on October 6, 2008 (07-02012, Dk. No. 462).

Specifically, the Court finds as follows:[5]

## Jurisdiction

This Court has jurisdiction over the parties and subject matter of this proceeding pursuant to 28 U.S.C. § 1334.  The parties consented to have this Court hear and adjudicate this Adversary.

## Procedural History

On May 24, 2007, Bayou Louie filed its original Petition for Specific Performanc (sic) and/or Damages (Adv. Dk. No. 5) against White in the Seventh District Court, Catahoula Parish, Louisiana, where it was assigned cause no. 24,629.  On February 15, 2008, Bayou Louie removed the state court action to the United States District Court for the Western District of Louisiana, where it was assigned case no. 1:08-CV-0235.  On April 21, 2008, Judge Dee D. Drell transferred the case to the United States District Court for the Southern District of Mississippi.  On April 25, 2008, Judge Daniel P. Jordan III referred the case to this Court.  The state court pleadings as well as documents related to the transfer and referral of the case to this Court can be found at Adv. Dk. Nos. 5, 6, and 8.

## Introduction

The facts and arguments in this Adversary were presented in a three and a half day trial.  The Trial included, at one end of the spectrum, attempts by witnesses at homespun humor with references to rabbits, alligators and cows, and, on the other end of the spectrum, surreptitious recordings of telephonic conversations including the most vulgar language.  During the Trial, counsel have accused each other of conduct ranging from intimidation to manufacturing evidence and suborning perjury. In this Opinion, the Court will sift through the evidence and determine the applicable law in rendering its decision.

---

[5]The following constitutes the findings of fact and conclusions of law of the Court pursuant to Federal Rule of Bankruptcy Procedure 7052.

## Facts

The relevant transactions began when White purchased a 4,927 acre farm in Catahoula Parish, Louisiana (the "Farm") in March of 2006 for $4,925,000 (approximately $1,000/acre). At about the same time, White also purchased two large tracts of land in Concordia Parish, Louisiana. White financed the transactions through Farm Credit Bank in Illinois, obligating himself to significant periodic interest payments. By the latter part of 2006, the interest payments became a financial burden to White.

On November 18, 2006, White signed an exclusive listing agreement ("Fields Contract") with Carroll Fields ("Fields"), a realtor doing business as Broker South Realty, Inc., in order to raise cash through the lease and/or sale of the Farm. The listing agreement obligated White to pay Fields a three percent commission. Two and a half weeks later, White met with Sciara,[6] who agreed to consult with White on various aspects of managing the Farm, including looking for potential tenants and/or buyers. The testimony was uncontroverted that White agreed to pay Sciara a two percent commission if he were to produce a tenant and/or buyer for the Farm. White told Sciara that he needed $100/acre lease payment on the Farm or wanted to sell the Farm for $6.6 million (approximately $1350/acre). Sciara testified that he could not find a tenant willing to pay $100/acre for a lease on the Farm.

Sciara met Heigle by chance while both men were looking at another tract of land. After several conversations, Heigle told Sciara that he would be interested in a lease/purchase deal on the Farm, wherein the $100/acre lease would include a down payment on the purchase at the $6.6

---

[6]Sciara, who was not employed by Broker South Realty, Inc., or otherwise connected to Fields, met independently with White.

million sales price.  Sciara introduced Heigle to White for the purpose of promoting this deal.  White traveled to Madison, Mississippi, met with Heigle, and negotiated the terms of a lease/purchase Agreement, by which White would make $750,000 net profit for owning the Farm approximately one year.

On February 15, 2007, a group met in the law offices of Jack Laird ("Laird") in Monroe, Louisiana, for the execution of the documents related to the lease/purchase of the Farm (the "Laird Meeting").  Present at the Laird Meeting were: Heigle, White, Sciara, Jerry Burris (White's friend and driver), Byron Bullock (White's financial adviser), and Laird.  It is undisputed that Laird represented White only in the transaction.  The credible testimony showed that Laird already had prepared the documents to be executed when the group gathered at Laird's office that day.  That testimony also showed that prior to or at the Laird Meeting, White knew that a corporation named Bayou Louie would be the purchaser of the property, that Bayou Louie would finance the purchase of the Farm, and that a different entity would farm the property, but that the Plaintiffs had not determined by the time of the Laird Meeting what entity actually would operate the Farm.

At the Laird Meeting, White presented the Fields Contract and asked Laird whether a commission to Fields would be owing on the sale to Bayou Louie.  According to the undisputed testimony, Laird reviewed the Fields Contract and noted that a commission would be owing pursuant to its terms.  White made it clear to those gathered at the Laird Meeting that he did not want to pay Fields a commission since Fields had not found the purchaser.  After significant discussion, Laird drafted a Letter of Intent (the "Letter of Intent") to which were attached and referenced a legal description of the Farm as Exhibit A, an Agricultural Lease and Security Agreement (the "Lease Agreement") as Exhibit B, and a Purchase Agreement (the "Purchase Agreement") as Exhibit C.

The Letter of Intent called for White and Bayou Louie to execute the Lease Agreement that day, and execute the Purchase Agreement on March 19, 2007, four days after the Fields Contract was to expire on March 15, 2007.

The testimony at Trial was clear that the sole purpose of the Letter of Intent was to create an argument for White not to have to pay Fields a commission on the sale of the Farm to Bayou Louie. It was undisputed that Laird stated he could not guarantee the Letter of Intent would thwart an attempt by Fields to collect a commission. The credible testimony indicated that Laird drafted the Letter of Intent in accordance with the parties' intent to be bound to each other and, in fact, he told the parties that signing the Letter of Intent bound the parties to each other. Before leaving the Laird Meeting, Bayou Louie, by and through Heigle, and White signed the Letter of Intent and the Lease Agreement. In effect, White testified at Trial that the entire agreement by and between White and Bayou Louie was contained in the Letter of Intent and the three attachments thereto. He also testified that the Letter of Intent provided that White would sign the Purchase Agreement on March 19, 2007.

Paragraph 7 of the Purchase Agreement provided that the closing would take place on or before July 16, 2007. Pursuant to paragraph 6.3 "Conditions To Closing" of the Purchase Agreement attached to the Letter of Intent, Bayou Louie's obligation to close the transaction was conditioned on White's having the Farm "reconstituted"[7] with the applicable Farm Service Agency. (Ex. P-1, Attach. C, ¶ 6.3). White accomplished this task sometime in May, 2007.

During the spring of 2007, White and Heigle had numerous conversations, many of which were recorded by Heigle. During some of these conversations, Heigle and White discussed revising

---

[7]Reconstitution involves obtaining a new farm number from the USDA. (Tr. 147-48). Citations to the transcript of the Trial will be designated as "(Tr. page nos.)."

the Lease Agreement to show that Arkla Miss would be the entity operating the Farm.  Heigle and White previously had discussed that an entity other than Bayou Louie would carry out the farming operation on the Farm.  On March 16, 2007, White executed the new lease agreement (the "Revised Lease Agreement").  On March 19, 2007, Arkla Miss[8], by and through Larry Coleman, a partner, executed the Revised Lease Agreement.   The only two differences in the Lease Agreement which was executed at the Laird Meeting and the Revised Lease Agreement were the name of the lessee, which changed from Bayou Louie to Arkla Miss, and the date of execution.

After the execution of the Revised Lease Agreement, Heigle arranged for financing with Focus Bank to make payment to White in the amount of $446,929.25.  As noted on the check, dated March 26, 2007, the check (Ex. P-3) represented payment for the down payment, rent, and $1,829.25 in interest that was due pursuant to ¶ 3 of the Revised Lease Agreement.[9]  White sent a courier to Focus Bank in order to retrieve the check.  White then immediately negotiated the check and made his interest payment on his note on the Farm with Farm Credit Bank.  In doing so, White averted his immediate financial crisis.

White asserts that the Revised Lease Agreement with Arkla Miss, signed on March 19, 2007, was a stand-alone contract and not a modification of the Lease Agreement set forth in the Letter of Intent.  The testimony at Trial, however, showed that by the time White signed the Letter of Intent on February 15, 2007, he was aware that an entity other than Bayou Louie would operate the Farm

_____

[8]The Revised Lease Agreement states that the lease agreement is by and between White and Arkla Miss.  The testimony at Trial showed that Arkla Miss is actually a partnership rather than a corporation.  It appears that this discrepancy was nothing more than a scrivener's error.

[9]The Revised Lease Agreement included a provision at Paragraph 3 that called for interest to be added to the rental payment if the payment was made after the due date of March 10, 2007.  This will be referred to herein as the "Late Payment Interest."

thereby necessitating a revision to the Lease Agreement. Additionally, throughout the spring of 2007, White and Heigle continued to discuss the impending sale and the progress of White's efforts to reconstitute of the Farm. Furthermore, White accepted and negotiated a check for $446,929.25 or $100/acre plus Late Payment Interest owed, part of which sum was attributable to the down payment for the purchase of the Farm as agreed to by the parties at the Laird Meeting and as set forth in the Purchase Agreement attached to the Letter of Intent.

Much was made of what the $100/acre rental price represented. Considerable testimony showed that a portion of the rental price represented the payment for the Lease Agreement and a portion of the rental price represented the down payment and consideration for the Purchase Agreement. In support of this assertion, it is noted that the $100/acre price was a 62% rent increase over the prior year. Further, the Purchase Agreement acknowledged that the rental price included consideration for the Purchase Agreement. (Purchase Agreement, ¶ 5).

Heigle testified that on March 19, 2007, he also signed the Purchase Agreement and sent it to White in accordance with the Letter of Intent. White claims that he did not receive it, but by the same token, he testified that he was not a good record keeper. White's lax record keeping is supported by the taped conversations in evidence. Heigle's testimony and the taped conversations in evidence demonstrated that Heigle made numerous demands on White to sign the Purchase Agreement pursuant to the terms of the Letter of Intent though White never did.

White then mistakenly thought that the closing date for Bayou Louie's purchase of the Farm was May 15, 2007. Once that date had passed, White authorized Laird to send Heigle a letter dated May 17, 2007 (Ex. P-10), stating that the sale of the Farm to Bayou Louie had expired with the passing of the May 15, 2007, closing date. The Purchase Agreement attached to the Letter of Intent,

however, set the closing date on the purchase of the Farm as July 16, 2007.

The evidence and testimony further showed that during the spring of 2007, White received offers on the Farm for more money. In taped telephone conversations entered into evidence, White admitted to Heigle that he had received higher offers on the Farm. Sciara also testified that White admitted to him that he was not going to go through with the sale to Bayou Louie because he had been offered more money and had agreed to sell the Farm to Bayou Louie for too low a price. Sciara testified that a man named Bill Hoxie ("Hoxie") came to the Farm and claimed that he was going to buy it. Apparently, Hoxie did indeed offer to buy the Farm from White for $7.3 million on May 15, 2007 (Ex. P-6), $700,000 more than Bayou Louie.

White contends that he did not sign the Purchase Agreement, in part, because he found out there was a judgment against Heigle and was concerned about Heigle's financial condition. White asserts that the judgment against Heigle was relevant to his decision not to close the deal with Bayou Louie because he was looking for a quick cash deal, and Heigle's financial condition could affect his ability to close. However, White did not cause the Letter of Intent drafted by his attorney, Laird, to include language which would have required Bayou Louie to provide to White a financial statement, a bank recommendation, or proof of ability to make a cash payment. Furthermore, White's own testimony showed that White knew that Bayou Louie would finance the purchase of the Farm at least by the time of the Laird Meeting on February 15, 2007. (Tr. 319). The knowledge that Bayou Louie would be financing the purchase of the Farm did not prevent White from signing the Letter of Intent in which he agreed to execute the Purchase Agreement on March 19, 2007, even though none of the documents required proof of a commitment from a lender to finance a transaction.

White also contends that he did not sign the Purchase Agreement on March 19, 2007, because he did not want to pay Fields a commission on the sale of the Farm. The uncontested testimony was that while Laird drafted the Letter of Intent as an attempt to prevent White from having to pay Fields a commission, Laird stated that he could not guarantee that outcome. If White had wanted to make the sale of the Farm contingent on not having to pay Fields a commission, he could have caused the documents to be drafted to include that contingency. He did not.

Heigle claims that White refused to sign the Purchase Agreement because he was no longer in a financial bind. On March 26, 2007, White received $446,929.25, which represented the down payment, rent, and the Late Payment Interest on the Farm, and immediately made his interest payment to Farm Credit Bank, thereby holding off what White described as the "death angel." Additionally, White had entered into a contract to sell two large tracts of land he owned in Concordia Parish, the sale of which netted White approximately $4.3 million. (Tr. 375). Finally, White had received a better offer on the Farm from a buyer produced by Fields thereby solving White's problem regarding paying commissions to both Fields and Sciara.

The Court must determine whose version of the facts is more credible. The Court finds that Heigle's version rings truer. Heigle's version also is supported by White's subsequent conduct whereby he extended the listing agreement with Fields and currently has the Farm listed for sale for $2,200/acre. Apparently, White now feels like he is in a financial position to wait until he gets a higher price from which he will pay Fields his commission. These actions support the assertion that White did not want to go forward with the sale to Bayou Louie because not only would he have presumably paid Sciara the two percent commission he had promised Sciara (approximately $132,000 on a $6.6 million sales price), he also may have had to pay the three percent commission

he had contracted to pay Fields ($198,000), thereby reducing his net profit from approximately $1.47 million to $1.272 million.

Also, much was made by White that Heigle never disclosed the members involved in Bayou Louie or Arkla Miss, the financial worth of Bayou Louie or Arkla Miss, Swarek's involvement in securing financing for the Purchase Agreement, or the Bank of Anguilla lawsuit against Heigle. White did not point to any documents which created any duty for Heigle to disclose any of those facts regarding his financial status. More importantly, despite the issues White claims to have uncovered about Heigle's financial status, he was not able to prove that Bayou Louie was unable to perform the Purchase Agreement. To the contrary, the testimony offered by both Heigle and Swarek was that Bayou Louie was able to perform the Purchase Agreement with the financial assistance of Swarek. Bayou Louie's duty to have the purchase money available did not arise until the closing. If assurances of Bayou Louie's ability to close on the purchase of the Farm were indeed important to White, he could have placed requirements in the Letter of Intent that Bayou Louie provide evidence of Bayou Louie's financial ability to perform. White did not make those requirements part of the transaction and could not, in hindsight, require Bayou Louie to have provided assurances that he, himself, did not request.

In summary, White took the old "ready, shoot, aim" approach to this deal. He negotiated a lease/purchase deal with Heigle. He had his attorney draft documents to effectuate the deal. He signed the Letter of Intent with its referenced attachments, and then, when he realized he could make more money, he tried to nullify the deal by denying that a contract existed.

**Issues**

1.       Whether the Amended Complaint was properly served upon White and, therefore, superceded the original Complaint;

2.       Whether the Letter of Intent formed a binding contract;

3.       Whether the Plaintiffs are entitled to specific performance on the Letter of Intent;

4.       Whether the Plaintiffs are entitled to monetary damages;

5.       Whether Focus Bank, Sanders, White, or Arkla Miss has the priority lien on the Winter Wheat Crop;[10]

6.       Whether White's Motion for Summary Judgment should be granted; and,

7.       Whether White's Motion to Strike should be granted.

**Discussion**

**1.       The Amended Complaint was properly served on White and, therefore, supercedes the original Complaint.**

The first issue the Court must address is whether the Amended Complaint was properly served upon White and, therefore, superseded the original Complaint.  As noted previously, the original Complaint in this matter was filed in Louisiana state court, removed to federal district court, and ultimately transferred to this Court based on Heigle's chapter 11 bankruptcy case.  Subsequently, the Plaintiffs filed a Motion to Amend Complaint (Adv. Dk. No. 84) seeking leave to add additional plaintiffs, defendants, and causes of action.  The Certificate of Service attached to the Motion to Amend Complaint certifies that it was delivered by ECF electronic notification or e-mail to Eileen

---

[10]This issue was raised by Focus Bank and Sanders in their Answers and is discussed *infra*.  Plaintiffs argue that this Winter Wheat Crop is a 2007 crop because it was planted in 2007.  Sanders, however, argues that it is a 2008 crop because it was harvested in 2008.  For purposes of this Opinion, it will be referred to as the "Winter Wheat Crop."

N. Shaffer and Sedric E. Banks, both counsel for White. An Order Granting the Motion to Amend Complaint was entered thereafter (Adv. Dk. No. 93).

Subsequently, the Amended Complaint (Adv. Dk. No. 103) was filed, naming Bayou Louie, Arkla Miss, and Heigle as Plaintiffs. The Amended Complaint named White, JW's Louisiana Lands, LLC ("JW's"), Hoxie, M&H Farms, LLC ("M&H"), and John Does A-Z ("John Does") as Defendants. The Certificate of Service attached to the Amended Complaint certifies that it was delivered by ECF electronic notification or e-mail to the attorneys for White.[11]

At the Trial, White argued for the first time that he was not properly served with the Amended Complaint and, therefore, this Court lacks personal jurisdiction over him with regard to the claims asserted by the newly named Plaintiffs. More specifically, White contends that because the Amended Complaint added new Plaintiffs, personal service of a summons, and the Amended Complaint was required upon all Defendants.

Federal Rule of Civil Procedure ("Civil Rule") 4(c)(1), made applicable to bankruptcy proceedings by Federal Rule of Bankruptcy Procedure ("Bankruptcy Rule") 7004, provides:

**(c) Service.**

> **(1) In General.** A summons must be served with a copy of the complaint. The plaintiff is responsible for having the summons and complaint served within the time allowed by Rule 4(m) and must furnish the necessary copies to the person who makes service.

---

[11] A summons was issued via ECF to Eddie J. Abdeen (Adv. Dk. No. 116) for service of the summons and Amended Complaint on the original Defendant, White, as well as the newly named Defendants. However, because the Plaintiffs eventually determined that they would not pursue any newly asserted claims against the new Defendants, the summons, and Amended Complaint were never served on any of the Defendants. Only the Amended Complaint was served on White's attorneys.

Civil Rule 4(c)(1).  Bankruptcy Rule 7004 further provides that personal service of a "summons and complaint" may be made upon an individual by first class mail or, in accordance with Civil Rule 4(e) by delivering a copy of "the summons and of the complaint" to the individual personally.  Service of a summons in accordance with Bankruptcy Rule 7004 or applicable provisions of the Civil Rules is effective to establish personal jurisdiction over a defendant.  Bankruptcy Rule 7004(f).

White maintains that because the Amended Complaint added new plaintiffs, a summons and the Amended Complaint must have been served upon each Defendant in order to establish personal jurisdiction.  However, Civil Rule 5, made applicable to bankruptcy proceedings by Bankruptcy Rule 7005, states:

**Rule 5.  Serving and Filing Pleadings and Other Papers.**

**(a) Service: When Required.**

**(1) In General.**  Unless these rules provide otherwise, each of the following papers must be served on every party:
. . . .

(B) a pleading filed after the original complaint, unless the court orders otherwise
. . . .

. . . .

**(b) Service: How Made.**

**(1) Serving an Attorney.**  If a party is represented by an attorney, service under this rule must be made on the attorney unless the court orders service on the party.

Civil Rule 5(a)(1), (b)(1).  Based on Civil Rule 5(a)(1)(B) and (b)(1), service of the Amended Complaint was accomplished by service upon White's attorneys.  Service of a summons and the Amended Complaint on White was not required to establish personal jurisdiction.  Allen v. Mayhew,

2008 WL 223662, *7 (E.D. Cal. 2008) (while Federal Rule of Civil Procedure 4 requires personal service of summons and second amended complaint for newly named defendants, defendant named in original complaint and previously served with process was properly served with second amended complaint pursuant to Federal Rule of Civil Procedure 5(b)(1) by plaintiff's mailing a copy of the second amended complaint to the attorney of record for the defendant named in original complaint); Fashion Novelty Corp. of N.J. v. Cocker Mach.and Foundry Co., 331 F. Supp. 960, 962 (D.C. N. J. 1971) (where court observed that an amended complaint clearly was 'subsequent to the original complaint' and thus fell squarely within the quoted provisions of Rule 5, and found that jurisdiction was acquired over the defendant when the original complaint was served with summons, there being no requirement that it be reasserted by a second summons).

As a final observation, White never raised personal jurisdiction as an issue prior to the Trial. In fact, the Pretrial Order entered in this case, which was approved by White's counsel, contradicts White's argument.  That is, the Pretrial Order contains the statement that "[t]his Court has jurisdiction of the subject matter herein and the parties thereto" and references parties and claims set forth in the Amended Complaint.  (Adv. Dk. No. 176).  The purpose of the Pretrial Order is to supercede previously filed pleadings and to govern the issues and evidence presented at the Trial. Quick Technologies, Inc. v. Sage Group, PLC, 313 F.3d 338, 346 n. 5 (5th Cir. 2002) (joint pretrial order signed by both parties supercedes all pleadings and governs the issues and evidence to be presented at trial).  Thus, approval of the Pretrial Order further undermines White's argument. Personal jurisdiction over White was established when the summons and original Complaint were served on him.

## 2.     The Letter of Intent together with the attachments formed a binding contract.

### A.     Louisiana Contract Law.

Louisiana law defines a contract as "an agreement by two or more parties whereby obligations are created. . . ." *See* Lorusso v. Landrieu Enter., Inc., 848 So. 2d 656, 658 (La. App. 2003) (citing LA. CIV. CODE art. 1906). Stated another way, a contract is "a[n] agreement between parties, where their minds have met upon all essentials." Mermelstein v. Schwab, 64 So. 2d 37, 38 (La. App. 1953). Louisiana Civil Code article 1927 states that "a contract is formed by the consent of the parties established through offer and acceptance." Once a meeting of the minds has taken place, the parties are bound to the agreement "at once although they may have agreed that they would thereafter execute a formal instrument containing the terms of the present agreement." Campbell v. Melton, 817 So. 2d 69, 74 (La. 2002). "A party claiming the existence of a contract has the burden of proving that the contract was perfected between himself and his opponent." State v. Pelas, 745 So. 2d 1215, 1217 (La. App. 1999).

The purpose of interpreting a contract is "the determination of the common intent of the parties with courts giving contractual words their prevailing meaning unless the words have acquired a technical meaning." Campbell, 817 So. 2d at 74 (citing LA. CIV. CODE arts. 2045, 2047; Louisiana Ins. Guar. Ass'n v. Interstate Fire and Cas. Co., 630 So. 2d 759, 763 (La. 1994)); *see also* Blalock v. Lord, 927 So. 2d 1142, 1151 (La. App. 2006) (citing LA. CIV. CODE arts. 1983 and 2045). Louisiana Civil Code article 2046 states that "when the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." *See also* Blalock, 927 So. 2d at 1151; Di Cristina v. Weiser, 42 So. 2d 868, 870 (La. 1949).

Parol or extrinsic evidence is generally inadmissible to vary the terms of a written contract unless the written expression of the common intention of the parties is ambiguous.  <u>Campbell</u>, 817 So. 2d at 75 (internal citations omitted).  If, however, terms of a contract are susceptible to different meanings, Louisiana law states that courts must "interpret them in the manner that best conforms to the object of the contract."  <u>Armand v. Belt</u>, 799 So. 2d 507, 508 (La. App. 2001) (citing LA. CIV. CODE art. 2048).  Additionally, a single provision of a contract "must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole."  <u>Id.</u> at 508 (citing LA. CIV. CODE art. 2050).  Moreover, courts are required to interpret a doubtful contract provision "in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and of other contracts of a like nature between the same parties." <u>Id.</u> (citing LA. CIV. CODE art. 2053).

Under Louisiana law, courts must interpret ambiguous contract provisions against the party who furnished them.  <u>Armand</u>, 799 So. 2d at 508.  Additionally, Louisiana rules of contract construction require courts to adapt "an interpretation in accordance with justice and fair dealing with doubts resolved against the seller." <u>Southern-Gulf Marine Co. No. 9, Inc. v. Camcraft, Inc.</u>, 410 So. 2d 1181, 1184 (La. App. 1982).

### B.      Contracts to Sell.

Pursuant to Louisiana law, a "sale is a contract whereby a person transfers ownership of a thing to another in return for a price in money." LA. CIV. CODE art. 2439.  The elements necessary for a contract for sale to be perfected are: (1) the thing contracted for, (2) the price of the thing contracted for, and (3) the consent of the involved parties.  <u>Id.</u>  A sale has taken place when the parties have agreed on the thing and the price.  <u>Blalock v. Lord</u>, 927 So. 2d 1142, 1154 (La. App. 2006).

Louisiana Civil Code article 1947 states that, "absent a legal requirement, if the parties intend for the contract to be in one form, they are not bound until it is in that form." In Louisiana, "when parties intend from the beginning to reduce their negotiations to a written contract, neither the plaintiff, nor the defendant is bound until the contract is reduced to writing and signed by them." JCD Marketing Co. v. Bass Hotels and Resorts, Inc., 812 So. 2d 834 (La. App. 2002) (citing Breaux Bros. Constr. Co. v. Associated Contractors, 77 So. 2d 17, 20 (La. 1954)); *see also* Baldwin v. Bass, 685 So. 2d 436 (La. App. 1996).

### C.    Contracts to Sell Immovables.

Louisiana Civil Code article 2440 states that "[a] sale or promise of sale of an immovable must be made by authentic act or by act under private signature, except as provided in Article 1839."[12] The sale of an immovable must be in writing, but all its essentials need not be evidenced by the same instrument. *See* Labauve v. Declouet, 19 La. 376, 376 (La. 1841). Additionally, the writing need not be signed by both parties to entitle either party to specific performance. *See* Milliman v. Peterman, 519 So. 2d 238, 241 (La. App. 1988); Miller v. Miller, 335 So. 2d 767 (La. App. 1976). "Acceptance may be established by evidence extraneous to the written instrument." Id. at 242.

### D.    Promises to Sell in the Future.

Louisiana law recognizes promises to sell in the future as contracts. Louisiana Civil Code article 2623 states:

An agreement whereby one party promises to sell and the other promises to buy a

---

[12]The exception set forth in Louisiana Civil Code article 1839 allows oral transfers of immovable property "when the property has actually been delivered and the transferor recognizes the transfer when interrogated on oath."

thing at a later time, or upon the happening of a condition, or upon performance of some obligation by either party, is a bilateral promise of sale or contract to sell. Such an agreement gives either party the right to demand specific performance.

A contract to sell must set forth the thing and the price, and meet the formal requirements of the sale it contemplates.

Id.; *see also* Campbell, 817 So. 2d at 74. "The doctrine that one may make a present binding agreement to enter into a future contract, the terms of which have been agreed upon, was expressly recognized in Kaplan v. Whitworth, 40 So. 723." Knights of Pythias v. Fishel, 123 So. 724, 725 (La. 1929) (citing Kaplan v. Whitworth, 40 So. 723 (La. 1906)).

### E.    Letters of Intent.

Louisiana courts determine the enforceability of letters of intent as binding contracts depending on the facts of the particular case. The intent of the parties, rather than the title of the document, is the dispositive factor. Campbell, 817 So. 2d at 74. The parties' intent must be determined from the language of the document, or, if the language of the document is ambiguous, from the conduct of the parties. Id.

Where the facts showed that the parties intended to be bound by the letter of intent, courts in Louisiana have enforced letters of intent as binding contracts even where the letter of intent specified that a more "formal agreement" would follow later. *See* Dickerson v. Cajun Commc'n, 910 So. 2d 477, 480-81 (La. App. 2005). In Dickerson, the court held that the provision that a more "formal agreement" would follow did not evidence the parties' intent to be bound only by the subsequent writing. Id. Dickerson follows the holding in Mermelstein v. Schwab, 64 So. 2d 37, 38 (La. App. 1953), where the court held that

[t]he settled jurisprudence of this State is that an agreement between parties, where their minds have met upon all essentials, constitutes a contract between them and

Page 19 of  45

> binds them at once although they may have agreed that they would thereafter execute
> a formal instrument containing the terms of their present agreement.

Id.  The Mermelstein court held further that the "tentative agreement declared upon in the petition

would have the force and sanctity of a valid contract between the parties until such time as the

contemplated contract was prepared . . . and executed." Id.

Likewise, in the case of O'Glee v. Whitlow, a Louisiana court found that parties to a

preliminary written agreement were bound to that agreement even though they contemplated

executing formal sales documents once they were drafted. O'Glee v. Whitlow, 756 So. 2d 1288 (La.

App. 2000).  In O'Glee, the preliminary written agreement was signed by both parties.  Id. at 1290.

The purchase price and terms were agreed upon through a document labeled as a promissory note

with an attached amortization schedule.  Id.  Before the "sales documents" were drafted and

executed, the parties began to perform the contract.  Id.  The court held that the parties were bound

to the preliminary agreement even though they contemplated a later, more formal, agreement because

they had evidenced their intent to be bound by their performance of the contract.  Id. at 1293.  *See*

*also* Myers v. Burger King Corp., 638 So. 2d 369 (La. App. 1994) (parties bound to a construction

contract by their performance even before formal execution of Purchase Agreement).

Where the letter of intent included language that "[o]bviously, neither of us will be bound

until a contract is executed by both parties," the court held that the letter of intent was not an

enforceable contract.  Spillway Inv. v. Pilot Ctr., LLC, 2005 WL 517498 (E.D. La. 2005).  A

Louisiana appellate court also struck down a letter of intent in McIntire v. Industrial Sec., 158 So.

849 (La. App. 1935).  The McIntire court found that the parties had not reached a meeting of the

minds.  Id. at 851.  That court did hold, however, that when "the parties have agreed to all the

essential terms and the agreement is complete in itself, the refusal of one of the parties to sign the written document merely evidencing what has already been agreed to does not destroy the effect of the contract already verbally assented to."  Id.

**F.    Application to the Case at Bar**.

In this case, White has relied on Louisiana Civil Code article 1947 as the basis for his assertion that no contract to sell the Farm ever existed between White and the Plaintiffs.  White asserted that he and the Plaintiffs contemplated reducing the deal to writing in a purchase agreement and that because he never signed the Purchase Agreement attached to the Letter of Intent, he is not bound by it.  White's reliance on Louisiana Civil Code article 1947 is misplaced.

**i.    The parties reduced their agreement to a writing to which they are bound.**

First, the parties did reduce their agreement to writing in the form of the Letter of Intent with exhibits attached and referenced.  The Letter of Intent, together with its exhibits, is a writing and was signed by both Heigle, on behalf of Bayou Louie, and White.  The Letter of Intent includes language that clearly evidences bilateral promises.  Additionally, the language of the Letter of Intent, together with the language of the referenced exhibits, identifies the thing to be bought and sold as well as the price.  As such, the Letter of Intent is a promise to sell under Louisiana Civil Code article 2623 and comports with Louisiana Civil Code article 2440 which generally requires a contract for the sale of immovables to be in writing.  In this promise to sell, both parties obligated themselves "to execute and exchange executed originals of the signature page of the Purchase Agreement on or before March 19, 2007."  (Ex. P-1).

At Trial, White even testified that the Letter of Intent together with its exhibits constituted his entire agreement with Heigle. (Tr. 325-26, 332-33). White also testified that the Letter of Intent stated that he would execute the signature page of the Purchase Agreement because he already knew what the Purchase Agreement said. (Tr. 328). Furthermore, White admitted that the Letter of Intent contained no conditions precedent to his executing the Purchase Agreement. (Tr. 328). By his very testimony, White evidenced his intent to be bound by the Letter of Intent when he executed it on February 15, 2007. White breached by refusing to sign and exchange the signature page to the Purchase Agreement attached to the Letter of Intent.

### ii.    The Letter of Intent is not ambiguous.

Second, the Letter of Intent is not ambiguous. White asserted at Trial that two provisions of the Letter of Intent demonstrate that the parties did not intend to be bound until the Purchase Agreement was signed by both. This first such provision, found in paragraph "3. Standstill." states: "After the execution of the Purchase Agreement and Related Documents, the obligations of the parties shall be governed by the terms of the Purchase Agreement and Related Documents." (Ex. P-1). This provision is not ambiguous. This Court agrees with and adopts the reasoning of the Dickerson court that held although the parties have agreed to be bound by terms of the Purchase Agreement once executed, "we do not believe that this demonstrates an intent to be bound *only* by [the] subsequent[ly executed] document." Dickerson, 910 So. 2d at 480.

The second such provision, found in paragraph "5. General" states: "This Letter of Intent is meant to outline the material terms of the transaction and provide a conceptual framework and outline for the transaction contemplated between the parties." White argued at Trial that the Letter of Intent provided a "conceptual framework" which would not take form until the Purchase

Agreement was signed by both parties. "Conceptual" does not mean inchoate. Nothing in the language of the Letter of Intent evidences incompleteness.

Furthermore, one provision in particular demonstrates the parties' clear intent to be bound by the Letter of Intent. Paragraph 2 of the Letter of Intent plainly states that "the parties agree to execute and exchange executed originals of the signature page of the Purchase Agreement on or before March 19, 2007." No ambiguity exists in that provision. The parties did not promise to sign a purchase agreement yet to be drafted; they agreed to execute the Purchase Agreement attached to the Letter of Intent. The parties knew, at the time they signed the Letter of Intent, exactly every provision of the Purchase Agreement they were obligated to sign in the future.

Moreover, White argued at Trial that he was not obligated to sign the Purchase Agreement because the Fields commission issue had not been resolved. This argument must fail. While the credible testimony shows that White had Laird create the Letter of Intent for the purpose of avoiding paying Fields a realtor commission, absolutely no provision in the Letter of Intent, including the attachments, in any way conditions the promise to sell on the resolution of the Fields commission issue in White's favor. White admitted at Trial that the Letter of Intent included no conditions precedent to his executing the Purchase Agreement. (Tr. 328). White's parol evidence that such condition precedent was understood within the context of the deal is inadmissible to vary the terms of an unambiguous written contract. Campbell, 817 So. 2d at 75.

Finding that the Letter of Intent is not ambiguous, the Court holds that White was obligated by contract to execute the Purchase Agreement on or before March 19, 2007. His failure to do so constituted breach of the contract to sell as provided for under Louisiana law.

      iii.    **Even if the Letter of Intent includes ambiguous language, such ambiguity must be construed against White.**

While this Court finds that none of the provisions of the Letter of Intent are ambiguous, even if some provisions were, it is well-settled law that any such ambiguity must be construed against White as the party who furnished the language.  <u>Armand</u>, 799 So. 2d at 508.  Moreover, doubts regarding contract provisions must be resolved against the seller.  <u>Southern-Gulf Marine Co. No. 9</u>, 410 So. 2d at 1184.  Here, the seller is White.

Assuming *arguendo* that any ambiguity exists in the Letter of Intent, it exists because White created it.  The testimony at Trial showed that White produced the Fields contract at the Laird Meeting and expressed his desire to avoid paying Fields a commission on the sale of the Farm to Bayou Louie.  To accommodate White's desire, on one hand, to create a binding contract with Bayou Louie for the sale of the Farm, and, on the other hand, to avoid his contractual obligations to Fields, Laird drafted the Letter of Intent.  The sole purpose of the Letter of Intent was to create an argument for White that he did not owe Fields a commission because the sale to Bayou Louie did not fall within the time frame of the Fields Contract.  The testimony also showed that Laird explained that the Letter of Intent may not be effective against a claim by Fields for a commission.  Additionally, the testimony showed that Laird told the parties at the Laird Meeting that signing the Letter of Intent created a binding agreement between them.  With this knowledge, White executed the Letter of Intent.

      iv.    **White's actions demonstrate his intent to be bound by the Letter of Intent.**

Moreover, the credible evidence and testimony showed that White's actions demonstrated his intent to be bound by the contract to sell as set forth in the Letter of Intent.  *See* <u>O'Glee</u>, 756 So.

2d at 1288.  In multiple recordings of telephone conversations, White admitted to Heigle that he had received other offers on the Farm but reiterated that he was obligated to Heigle.  White also admitted at Trial that he had told Heigle about receiving better offers on the Farm, but had assured Heigle he was not going to accept them.  (Tr. 313).  White also worked toward reconstituting of the Farm, a condition set forth in ¶ 6.3 of the Purchase Agreement.  Moreover, White accepted a check in the amount of $446,929.25 with the clear notation that it was payment for the down payment, rent and late payment interest as outlined by various provisions included in the Letter of Intent and attached exhibits.

Thus, White's actions evidenced his intent to be bound by the Letter of Intent and, consequently, he was contractually obligated to execute the Purchase Agreement on or before March 19, 2007.  Again, his failure to do so constituted breach of the contract to sell as provided for under Louisiana law.

**3.     The Plaintiffs are entitled to specific performance on the Letter of Intent.**

Under Louisiana's civil law, specific performance is the preferred remedy for breach of contract.  Bourgeois v. Dunn, 822 So. 2d 708, 711 (La. App. 2002).  Louisiana Civil Code article 1986 states:

> Upon an obligor's failure to perform an obligation to deliver a thing, or not to do an act, **or to execute an instrument**, the court shall grant specific performance plus damages for delay if the obligee so demands.  If specific performance is impracticable, the court may allow damages to the obligee.
>
> Upon a failure to perform an obligation that has another object, such as an obligation to do, the granting of specific performance is at the discretion of the court.

Id. (emphasis added).  Interpreting this article, Louisiana courts have held that "[u]pon the obligor's failure to perform an obligation, the obligee is entitled to demand specific performance. . . ."  Amend

v. McCabe, 649 So. 2d 1059, 1062 (La. App. 1995) (reversed on other grounds) (citing LA. CIV. CODE art. 1986).

In the case at bar, White failed to execute the Purchase Agreement in accordance with the Letter of Intent.  Plaintiffs are entitled to a judgment against White for specific performance.

**4.     The Plaintiffs may be entitled to recover monetary damages.**

In addition to the remedy of specific performance for breach of contract, Louisiana law also allows for the recovery of monetary damages that result from the obligor's delay in performing its obligations under a contact.  LA. CIV. CODE art. 1986; Lombardo v. Deshotel, 647 So. 2d 1086, 1090 (La. 1994); Amend, 649 So. 2d at 1062.  Under Louisiana law, an obligor who acts in good faith is liable only for damages that were foreseeable at the time the contract was made.  LA. CIV. CODE art. 1996.  An obligor who acts in bad faith, however, is liable for all damages, foreseeable or not, that are a direct consequence of his failure to perform on his contract.  LA. CIV. CODE art. 1997.

Louisiana law defines "bad faith" as "more than mere bad judgment or negligence, it implies the conscious doing of a wrong for dishonest or morally questionable motives."  Id. cmt. (b) and (c); Weysham v. Harney, 518 So. 2d 1059, 1061 (La. Ap. 1987).  Louisiana courts have also adopted the Black's Law Dictionary definition of bad faith as:

> The opposite of "good faith", generally implying or involving actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties but by some interested or sinister motive.

Bond v. Broadway, 607 So. 2d 865, 867 (La. App. 1992).

In Bond, the buyer breached a real estate purchase agreement by refusing to honor his obligation to buy a parcel of residential real estate.  Id. at 866.  The buyer rationalized his refusal to

close on alleged defects in the property despite the fact that the purchase agreement contained language that the property would be purchased "as is." Id. at 867. The trial court and the appellate court found that the alleged defects were "all minor problems, easily discoverable by simple inspection and were not sufficient cause to refuse to honor the contract." Id. at 867. Under these facts, the court concluded that the buyer breached the contract in bad faith. Id. In light of the buyer's bad faith, the court further held that the buyer was liable to plaintiffs for both foreseeable and unforeseeable damages. Id. at 867-68.

In the case at bar, the Court finds that White rationalized his failure to perform on the Purchase Agreement using various excuses: (1) the unresolved realtor's commission; (2) Bayou Louie's alleged inability to secure financing; (3) doubts he had about "some issues" in Heigle's life[13]; and, (4) advice of counsel. (Tr. 371-72). The Letter of Intent, however, contains no provisions that would excuse White's failure to perform based on any of these excuses.

Despite being given numerous opportunities at Trial, White was unable to articulate any clear explanation as to why he did not adhere to the provisions of the Letter of Intent and wait to determine if Plaintiffs would be able to close on the Purchase Agreement by the closing date of July 16, 2007. The Court holds that given: (1) White's inability to articulate any good faith basis for repudiating his contract with Plaintiffs two months before the closing date; (2) the fact that White received a higher offer from Hoxie on the Farm just before White purported to cancel the deal with Plaintiffs; and (3) White's decision to list the Farm with Fields again at a higher asking price, White breached his contract with Plaintiffs in a bad faith attempt to reap a higher profit. White, therefore, is liable

---

[13]Additionally, White admitted at Trial that the Letter of Intent did not include any provision which would have allowed him to rescind the contract if a background investigation of Heigle proved to be unacceptable to White. (Tr. 371).

to Plaintiffs for foreseeable and unforeseeable damages that are a direct consequence of his failure to perform.  LA. CIV. CODE art. 1997.

### A.    Crop Loss Damages.

Plaintiffs have made a claim for crop loss damages in the amount of $365,657.  Plaintiffs' argument was presented at Trial, through the testimony of Jay Calhoun ("Calhoun")[14] and others, as follows: (1) White failed to perform on the Purchase Agreement, creating litigation over the ownership of the Farm; (2) Plaintiffs obtained catastrophic loss coverage rather than the 70% coverage they desired because, as the planters of the 2008 crops, they would be liable for the approximately $90,000 premium on the 70% policy even if the Court were to determine that Plaintiffs were not entitled to ownership of the Farm; (3) Plaintiffs lost the 2008 spring milo and soybean crops to Hurricane Gustav; and, (4) the difference in payout amounts between the catastrophic policy and the 70% policy was $365,657.

Framed correctly, Plaintiffs' argument is that they were unwilling to obtain the 70% policy because they could be liable for an approximately $90,000 premium to insure the 2008 crops when they were unsure if they would be awarded rights to the proceeds of those 2008 crops.  The testimony of Calhoun showed that he was willing and able to sell Plaintiffs the 70% policy they wanted.  Plaintiffs did not buy the higher level policy because they were unwilling to take the risk of having to pay the $90,000 premium in the midst of litigation, not because they were unable to obtain the coverage.  Plaintiffs were, however, willing to spend significant sums of money on seed, fertilizer, other farming supplies, labor, and equipment for the planting and tending of the 2008 crops in the

---

[14]Calhoun was the insurance agent for Plaintiffs.  The parties stipulated that Calhoun would testify at Trial as an expert in the area of crop insurance.

midst of litigation.  The decision to purchase insurance on a crop is a business decision just like the many other business decisions a farmer makes in an attempt to grow a successful crop.  Given the risks involved, Plaintiffs could have chosen not to farm or they could have chosen to seek some other judicial relief.   As a result, the Court finds that Plaintiffs' crop loss is not causally connected to White's breach of contract.  Plaintiffs made the unwise decision not to insure their 2008 crop investment adequately.  They should bear the burden of the loss associated with that decision.

**B.      Post-breach Accrual of Interest on Purchase Price.**

Pursuant to Paragraph 6.5 of the Purchase Agreement, the Late Payment Interest would be added to the purchase price of the Farm if the closing occurred after May 15, 2007.  White denied the existence of any purchase agreement via Laird's letter to Heigle on May 17, 2007. (Ex. P-10).  Plaintiffs assert that, on account of White's bad faith breach, he has forfeited any right to collect any interest that would have otherwise accrued on the purchase price subsequent to May 17, 2007.  The Court agrees.  White cannot benefit from his own breach.  White should not collect any interest that would have accrued under the Purchase Agreement subsequent to May 17, 2007.

**C.      Payment of Plaintiffs' Attorneys' Fees and Expenses**.

As discussed *supra*, Plaintiffs are entitled to specific performance on the Letter of Intent, including, but not limited to, White executing and performing on the Purchase Agreement which is attached as Exhibit C to the Letter of Intent.  Paragraph 20 of the Purchase Agreement states:

> **20.      Attorneys' Fees**.  Should either the Buyer or the Seller employ an attorney or attorneys to enforce any of the terms and conditions hereof, or to protect any right, title, or interest created or evidenced hereby, or to recover damages for breach of the terms and conditions hereon, the non-prevailing party in any action pursued in a court of competent jurisdiction shall pay to the prevailing party all reasonable costs, damages, and expenses, including attorneys' fees, expended or incurred by the prevailing party.

Such contractual fee-shifting provisions are enforceable under Louisiana law.  *See* Richey v. Moore, 840 So. 2d 1265, 1268 (La. App. 2003); Curtis v. Curtis, 680 So. 2d 1327, 1332 (La. App. 1996); Bond v. Broadway, 607 So. 2d 865, 868 (La. App. 1992) (enforcing fee-shifting provision contained in a real estate purchase agreement and requiring breaching party to pay the prevailing party's attorneys' fees incurred at both trial and appellate levels).

Having found that White breached his contract with Plaintiffs, the Court holds that Plaintiffs conceivably are entitled to recover litigation-associated expenses.  The Court will conduct a separate hearing during which Plaintiffs will have to show that these damages meet the appropriate criteria and are recoverable under Paragraph 20 of the Purchase Agreement or applicable law.

### D.        Payment of Lenders' Attorneys' Fees and Expenses.

Plaintiffs' lenders, Focus Bank and Sanders, participated in the Adversary to protect their rights in the Farm and/or crop liens.  Focus Bank was made a Third-Party Defendant by Mr. White; Sanders has asserted a lien against the Winter Wheat Crop and the 2008 crops.  Focus Bank and Sanders have charged their attorneys' fees and expenses back to Plaintiffs under various loan documents and security interests held by Focus Bank and Sanders.  Plaintiffs argue that had White closed on the Purchase Agreement as he was obligated to do, Focus Bank and Sanders would not have incurred legal fees which they are now charging to Plaintiffs.

Plaintiffs have shown that they may conceivably be entitled to recover litigation-associated costs charged back to them by Focus Bank and Sanders.  A separate hearing will have to be held to give Plaintiffs, presumably with the assistance of Focus Bank and Sanders, an opportunity to show that whatever fees and expenses Focus Bank and Sanders are charging back to Plaintiffs meet the appropriate criteria and are recoverable under the various agreements or applicable law.

**5.      Focus Bank has the priority lien on the Winter Wheat Crop.**

**A.      Introduction.**

 In the issue before the Court, four entities assert competing interests with regard to the proceeds of the sale of the Winter Wheat Crop planted on the Farm in November, 2007.  The Winter Wheat Crop was harvested and sold pursuant to an Order of this Court (Adv. Dk. No. 169) entered on June 2, 2008, and the proceeds were placed in the chapter 11 trustee's escrow account until determination as to proper ownership.  Those entities and their alleged statuses are: White, the landowner/lessor; Arkla Miss, the farmer/lessee; Focus Bank, the lender/secured creditor; and, Sanders, as a lender and furnisher of supplies/secured creditor.  Focus Bank and Sanders claim their interests through their agreements with Arkla Miss.

With respect to these competing interests, Louisiana Revised Statute 9:4521 provides:

As a specific exception to R.S. 9:4770 and R.S. 10:9-201, the following statutory privileges and perfected security interests as affecting unharvested crops shall be ranked in the following order of preference, provided that such privileges and security interests have been properly filed and maintained in accordance with the central registry provisions of R.S. 3:3651 et seq.:

(1)      Privilege of the laborer, the thresherman, combineman, grain drier, and the overseer.

(2)      Privilege of the lessor.

(3)      Perfected security interests under Chapter 9 of the Louisiana Commercial Laws in the order of filing, as provided by R.S. 3:3651 et seq.

(4)      Privilege of the furnisher of supplies and of money, of the furnisher of water, and of the physician.

Id.  The claims of each of these four entities will be dealt with below.

**i.      Focus Bank.**

Focus Bank became involved in the subject controversy by virtue of extending a line of

credit, represented by loan number 61807, to Arkla Miss on March 23, 2007, in the amount of $950,000 (the "Focus Loan"). (Focus Ex. 1). Focus Bank financed the farming operations under the Lease Agreement. White benefitted from the Focus Loan to Arkla Miss by virtue of receiving Cashier's Check Number 0302181 from Focus Bank made payable to White in the amount of $446,929.25. White negotiated the check and made his interest payment to Farm Credit Bank.

Arkla Miss executed a Commercial Security Agreement ("Focus CSA") to secure the Focus Loan on March 23, 2007, pledging:

> **Farm Products and Supplies:**
> . . . .
> all crops, annual or perennial, and all products of the crops; and all feed, seed, fertilizer, [] and other supplies used or produced in Debtor's farming operations; **Government Payments and Programs**: All payments, accounts, general intangibles, and benefits including, but not limited to, payments in kind, deficiency payments, letters of entitlement, warehouse receipts, storage payments, emergency assistance and diversion payments, production flexibility contracts. . . under any preexisting, current, or future federal or state government program.
> . . . .
>
> **Specific Property Description:**
> . . . .
> ALL CROPS NOW GROWING OR CAUSED TO BE GROWN ON THE LAND AS DESCRIBED PER ATTACHED EXHIBIT "A" AND THE PROCEEDS OF THE SALE THEREOF. ALL GOVERNMENT PAYMENTS. AN ASSIGNMENT OF ANY AND ALL CROP, HAIL AND/OR MULTIPLE PERIL CROP INSURANCE.

(Capital letters in original)(the "Collateral"). The land described on the Exhibit "A" to the Commercial Security Agreement is the Farm. Focus Bank perfected its security interest in and lien against the Collateral by filing a UCC-1F Financing Statement on March 29, 2007, at 9:53 a.m. (Focus Ex. 5). Under section "4. This FINANCING STATEMENT covers the following collateral," Focus Bank listed:

ALL CROPS NOW GROWING OR CAUSED TO BE GROWN ON THE LAND AS DESCRIBED PER ATTACHED EXHIBIT "A" AND THE PROCEEDS OF THE SALE THEREOF. ALL GOVERNMENT PAYMENTS. AN ASSIGNMENT OF ANY AND ALL CROP, HAIL AND/OR MULTIPLE PERIL CROP INSURANCE.

(Capital letters in original). In the separate box entitled, "USE THE FOLLOWING AREA ONLY FOR FARM PRODUCTS REQUIRING EFFECTIVE FINANCING STATEMENT (EFS) FILING IN ACCORDANCE WITH FOOD SECURITY ACT OF 1985" under section "6. This FINANCING STATEMENT cover the following types (or items) of property," Focus Bank lists "SORGHUM."

On October 11, 2007, Arkla Miss used part of the proceeds of the Focus Loan to purchase approximately 6000 bushels for planting on the Farm. (Focus Ex. 6). In November 2007, the Winter Wheat Crop was planted on approximately 1100 acres of the Farm.

ii. **Sanders.**

On or about May 8, 2008, Sanders agreed to lend $1,400,000 to Arkla Miss "for debtors crop production during the 2008 crop year with a final maturity date of February 1, 2009." ("Sanders Loan") (Sanders Ex.1). The parties memorialized their agreement in a Loan Agreement (Sanders Ex. 1) and an Agricultural Security Agreement ("Sanders ASA") (Sanders Ex. 2). The Sanders ASA recites the identity of the collateral pledged by Arkla Miss to secure the Sanders Loan. In addition to other items and categories of collateral designated therein, the Sanders ASA identifies the following:

All farm products, including but not limited to:

> . . . .
> All WHEAT, SOYBEANS, CORN AND MILO and other crops grown, growing, or to be grown in ISSAQUENA, WARREN, HUMPHREYS, COPIAH, CLAIBORNE COUNTIES/CATAHOULA PARISH county(ies) in the state of Mississippi & Louisiana and elsewhere including, but not

limited to, any crops grown, growing or to be grown on the real property described on Schedule B attached hereto and incorporated herein by this reference. . . .

(Sanders Ex. 2). Schedule B includes the legal description for the Farm.

To perfect its crop lien under Louisiana law, Sanders filed a UCC-1F form. (Sanders Ex. 3). Under section "4. This FINANCING STATEMENT covers the following collateral," Sanders lists, "SEE ADDENDUM." On each of the four (4) addenda, Sanders states under section "16. Additional collateral description," "'All crops/farm products of every kind and description, planted or growing, or to be planted or growing within one year from the date hereof. . . .'" (Sanders Ex. 3A - D). In the separate box entitled, "USE THE FOLLOWING AREA ONLY FOR FARM PRODUCTS REQUIRING EFFECTIVE FINANCING STATEMENT (EFS) FILING IN ACCORDANCE WITH FOOD SECURITY ACT OF 1985" under section "6. This FINANCING STATEMENT cover the following types (or items) of property," Sanders lists, "WHEAT, SOYBEANS, CORN, [and] SORGHUM GRAIN."

### iii. White.

White claims that he is entitled to the proceeds of the Winter Wheat Crop as the lessor/owner of the Farm. Under Louisiana law, "[t]o secure the payment of rent and other obligations arising from the lease of an immovable, the lessor has a privilege on the lessee's movables that are found in or upon the leased property," including the crops produced by the land in agricultural leases. LA. CIV. CODE art. 2707. The lessor's privilege to secure "rents of immovables," however, is "on the crops of the year." LA. CIV. CODE art. 3217(3). The lessor must exercise his privilege to seize the crops either: (1) while they are on the leased property, (2) within fifteen days after removal, provided that they remain the property of the lessee and are identifiable, or (3) while in the custody of the

sheriff or other officer of the court after seizure.  LA. CIV. CODE art. 2710.

The lessor's privilege is a security device as defined by the Louisiana Code.  Standing alone, the privilege, needs no writing to be effective or enforceable.  Henry v. Pioneer Sweet Potato Co., 614 So. 2d 853, 856-57 (La. Ct. App. 1993); *see also* LA. REV. STAT. ANN. § 3:3652(15) ("'Security device' is. . . any privilege described in R.S. 9:4521, whether or not evidenced by a written instrument.").  Significantly, though, notice of the lessor's privilege on unharvested crops must be filed in Louisiana's central registry for the lessor to enjoy priority over properly perfected security interests.  Henry, 614 So. 2d at 857; Meyhoeffer v. Wallace, 792 So. 2d 851, 857-58 (La. Ct. App. 2001).  If the lessor's privilege is not so recorded, a properly perfected security interest will have priority.  Henry, 614 So. 2d at 857; Meyhoeffer, 792 So. 2d at 858; *see also* LA. REV. STAT. ANN. §§ 10:9-317(a), 10:9-322(a).

**B.      Resolving the Rights to the Proceeds from the Winter Wheat Crop.**

**i.      Focus Bank v. Sanders.**

As between Focus Bank and Sanders, Focus Bank has the priority lien on the Winter Wheat Crop.  Arkla Miss entered into the Revised Lease Agreement with White, giving Arkla Miss the right to engage in farming operations on the Farm.  Arkla Miss entered into the Focus CSA, giving Focus Bank rights in the crops grown or to be grown on the Farm.  On March 29, 2007, Focus Bank filed its UCC-1F Financing Statement which identified, among other collateral, "ALL CROPS NOW GROWING OR CAUSED TO BE GROWN ON THE [FARM]. . . AND THE PROCEEDS OF THE SALE THEREOF" (Capital letters in the original) (Focus Ex. 5), thereby perfecting its security interest in the Collateral.  LA. REV. STAT. ANN. § 10:9-302.  As required by statute, Focus Bank filed its financing statement with the clerk of the court in Catahoula Parish, which was subsequently

registered with the Secretary of State's Central Registry.  LA. REV. STAT. ANN § 10:9-401 et seq.

Focus Bank lent Arkla Miss the money to pay White the rent payment on the Farm in March 2007.

Focus Bank also lent Arkla Miss the money to pay for the approximately 6000 bushels to plant the

Winter Wheat Crop later that fall.  The Winter Wheat Crop, which was planted in 2007, clearly falls

within the Collateral described in Focus Bank's UCC-1F Financing Statement.  Thus, Focus Bank

has a perfected security interest in the Winter Wheat Crop and the proceeds of the sale thereof.

Sanders argues that its UCC-1F statement, filed on May 12, 2008, creates the priority lien

in the Winter Wheat Crop because the UCC-1F statement specifically lists wheat as one of the crops

serving as collateral for the Sanders ASA in the box headed, "USE THE FOLLOWING AREA

ONLY FOR FARM PRODUCTS REQUIRING EFFECTIVE FINANCING STATEMENT (EFS)

FILING IN ACCORDANCE WITH FOOD SECURITY ACT OF 1985" whereas the Focus Bank

UCC-1F lists only sorghum.  Sanders offers no authority to support its assertion that in the face of

a general description of collateral and a specific description of collateral on the same UCC-1F

statement, that the creditor's lien is limited only to the specific description.

Under Louisiana law, for an agricultural lien, a sufficient financing statement must contain:

(1) the debtor's name, (2) the secured party's or his representative's name, (3) an indication of the

collateral. LA. REV. STAT. ANN. §10:9-502(a).  Pursuant to Louisiana Revised Statute § 10:9-108(a),

"a description of personal property is sufficient, whether or not it is specific, if it reasonably

identifies what is described."  *See also* Agricredit Acceptance Co. v. Singleton, 767 So. 2d 137, 139

(La. App. 2000).  Louisiana Revised Statute § 10:9-108(b) states that examples of reasonable

identification of collateral include identifying the collateral by: specific listing, category, or any

method that makes the identity of the collateral "objectively determinable."  Focus Bank's listing

of "all crops now growing or caused to be grown on the [Farm]" makes the Winter Wheat Crop objectively determinable as collateral.

Additionally, Focus Bank, not Sanders, is the lender that provided the financing for the Winter Wheat Crop. To allow Sanders a priority lien on the Winter Wheat Crop would give Sanders a windfall by collecting proceeds on the sale of a crop for which it provided no financing. Moreover, the Order of this Court (Adv. Dk. No. 169) entered on June 2, 2008, specifically states in paragraph D:

> . . . .
> Jimmy Sanders, Inc. has committed to loan funds to Arkla Miss Farms for its farming operations including the Catahoula Parish, Louisiana property. Jimmy Sanders, Inc. shall be granted a first priority lien position on the crops planted on the Catahoula Parish, Louisiana property in the 2008 season.

The Court clearly stated that Sanders would have a priority lien position on crops <u>planted</u> in 2008. The Winter Wheat Crop was planted in 2007. The Court never intended for Sanders to have a priority lien position for the Winter Wheat Crop. In summary, Focus Bank has the priority lien on the proceeds of the Winter Wheat Crop over Sanders.

### ii.   Focus Bank v. White.

White's claim to the proceeds of the Winter Wheat Crop fails on two counts. First, White received a check from Focus Bank, on behalf of Arkla Miss, in the amount of $446,929.25 on March 26, 2007, with the notation "down payment / rent check $1,829.25 interest." White received his rent payment on the Farm pursuant to the Lease Agreement. White cannot claim the lessor's privilege to secure a rent payment he already has received. LA. CIV. CODE art. 3217(3). Second, even if White were able to utilize the lessor's privilege, his claim fails in the face of Focus's perfected security interest because he did not file a proper notice of his privilege to perfect the interest as required by

Louisiana law.  In summary, Focus Bank has the priority lien on the proceeds of the Winter Wheat Crop over White.

### iii.    Focus Bank v. Arkla Miss.

Since the Court finds that Focus Bank has a valid lien on the proceeds of the Winter Wheat Crop, it is unnecessary to determine what rights Arkla Miss would have had to the proceeds otherwise**.**

### 6.    White's Motion for Summary Judgment should be denied.

Rule 56 of the Federal Rules of Civil Procedure[15] provides that in order to grant a motion for summary judgment, the court must find that "[t]he pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see also* Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L. Ed. 2d 265 (1986).  In addition, when considering a motion for summary judgment, the court must view the pleadings and evidentiary material, and the reasonable inferences to be drawn therefrom, in the light most favorable to the non-moving party, and the motion should be granted only where there is not genuine issue of material fact.  Thatcher v. Brennan, 657 F. Supp. 6, 7 (S.D. Miss. 1986), *aff'd* 816 F.2d 675 (5th Cir. 1987) (citing Walker v. U-Haul Co. of Miss., 734 F.2d 1068, 1070-71 (5th Cir. 1984)); *see also* Matsushita Elec. Indus. Co., Ltd.v.Zenith Radio Corp., 475 U.S. 574, 587-88, 106 S.Ct. 1348, 1356-57, 89 L.Ed. 2d 538, 553 (1986).  An issue is genuine if "there is sufficient evidence favoring the nonmoving party for a factfinder to find for that party," and material if it would "affect the outcome

---

[15]Federal Rule 56 is made applicable to bankruptcy proceedings pursuant to Federal Rule of Bankruptcy Procedure 7056.

of the lawsuit under the governing substantive law." <u>Phillips Oil Co. v. OKC Corp.</u>, 812 F.2d 265, 272-73 (5th Cir. 1987).

The Court finds that genuine issues of material fact exist including, but not limited to, whether the parties intended to be bound by the Letter of Intent. *See* <u>Arabella Bus Barn, LLC v. Whole Foods Market, Inc.</u>, 928 So. 2d 675, 680 (La. App. 2006). The existence or nonexistence of a contract is a question of fact. *See* <u>Townsend v. Urie</u>, 800 So. 2d 11, 15 (La. App. 2001) (citing <u>Fox v. LAM</u>, 632 So. 2d 877, 878 (La. App. 1994). Pursuant to Louisiana law, the determination of the existence of a contract is a finding of fact, not to be disturbed unless clearly wrong. <u>O'Glee v. Whitlow</u>, 756 So. 2d 1288, 1291 (La. App. 2000). Additionally, the Louisiana Supreme Court has held that "where two permissible views of evidence exist, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong." <u>Townsend</u>, 800 So. 2d at 16 (citing <u>Stobart v. State Dept. of Transp. and Dev.</u>, 617 So. 2d 880, 883 (La. 1993)). Therefore, the Court holds that White's Motion for Summary Judgment is not well taken and should be denied.

**7.      White's Motion to Strike should be denied.**

On September 30, 2008, White filed his Motion to Strike. In the Motion to Strike, White asserts that Heigle committed fraud upon White by misrepresenting various entities' ability to perform contractual obligations to White, placing assets in the name of Rebecca Heigle to keep them out of reach of his creditors, and manufacturing and producing false documentary evidence in response to discovery subpoenas. Additionally, White asserts that counsel for the Plaintiffs suborned perjury in the depositions of Swarek, Rebecca Heigle, and Gloria Fisher.

**A.     Heigle's alleged fraud regarding ability to perform**.

First, White asserts that Heigle committed fraud because Bayou Louie and Arkla Miss did not have the financial ability to perform the Lease/Purchase agreement negotiated by Heigle on their behalf. However, White failed to prove this point. White did not cause the Letter of Intent to be drafted to require Bayou Louie, Heigle, or Arkla Miss to make disclosures about capitalization or financial ability, and, as a result, no contractual duty to do so existed. Additionally, the credible evidence showed that Arkla Miss was able to pay White $446,929.25, which represented the down payment, the lease payment and Late Payment Interest due pursuant to ¶ 3 of the Revised Lease Agreement. Furthermore, the uncontested testimony of Swarek was that, as a member of Bayou Louie, he would have been able to secure financing through MetLife so as to perform the obligations set forth in the Purchase Agreement. The reason that Bayou Louie was not able to perform its contractual obligations was because White repudiated the contract before the closing date set forth in the Purchase Agreement.

**B.     Heigle's alleged fraud regarding assets.**

Second, White asserts that Heigle committed fraud by placing assets in the name of Rebecca Heigle to keep them out of reach of his creditors. The Court entered a Judgment on the Pleadings (Adv. Dk. No. 166), agreed to by White, which found that White had no claims against Heigle prior to June 29, 2007. Any transfers Heigle made to his wife, if any, regarding ownership of Bayou Louie occurred prior to June 29, 2007. Therefore, White has no claims regarding any such transfers. Additionally, White did not make any inquiries into the ownership of Bayou Louie, nor did he condition the sale of the Farm to Bayou Louie on Heigle being an owner Bayou Louie. Therefore, White's arguments on this point are without merit.

C.   **Plaintiffs' and Plaintiffs' Counsel's alleged manufacturing of evidence and subornation of perjury.**

Third, White asserts that Bayou Louie manufactured and produced false documentary evidence in response to discovery requests and subpoenas when it created corporate organizational documents after receiving requests for such documents.  In connection with this allegation, White also asserts that Plaintiffs' counsel suborned perjury regarding the evidence.

These allegations arise out of Request #4 of White's First Requests for Production of Documents ("Requests for Production of Documents") which  requested copies of the formation documents, including Articles of Incorporation, By-Laws, Operating Agreements, and minutes of any meetings held by organizers, members or officers (collectively, the "Organizational Documents").   Copies of the Organizational Documents were produced.   The Articles of Incorporation (Ex. P-13) filed with the Secretary of State show that Bayou Louie was incorporated on February 12, 2007.  The other Organizational Documents of Bayou Louie (Ex. D-6) are all dated "effective" as of February 12, 2007.  (Ex. D-6).  White then subpoenaed the original Organizational Documents of Bayou Louie.   The original Organizational Documents were produced during depositions held August 15 and 16, 2008.

i.   **Manufacturing Evidence**.

White asserts that Plaintiffs and counsel for Plaintiffs manufactured evidence by creating the Organizational Documents after receiving the Requests for Production of Documents.  The Court finds White's allegations unfounded.

First, the fact that the Organizational Documents of Bayou Louie state they are "effective" as of February 12, 2007, patently shows that they were not executed on that date.  Dating documents

with an "effective" date is a customary and acceptable method to show readers that the documents were executed on a date other than the date the documents take effect. Corporate organizational documents are often drafted after the articles of incorporation are filed with the Secretary of State and dated "effective" as of the date of filing. Additionally, pursuant to Article 7, Section 180 of the Mississippi Constitution, corporations have two years from the date of incorporation within which to organize and begin business. Other corporate record keeping requirements, found at Section 79-4-16.01 of the Mississippi Code, impose no time constraints on the creation of minutes of shareholder and board of directors meetings.

Second, the fact that the Organizational Documents show an "effective" date put White on notice to inquire about the timing of their creation and execution if he was so inclined. White propounded no written discovery requests to that effect. Apparently, counsel for White did ask about the date of execution in the depositions of Rebecca Heigle, Gloria Fisher, and Swarek as discussed below.

From the information presented, the Court finds nothing sinister in the fact that Bayou Louie's Organization Documents were drafted after its formation and dated so that they were made retroactive to the date of formation. Mr. Abdeen drafted the Organizational Documents after the incorporation of Bayou Louie and after the current litigation began, but within the two-year period of time specified under Article 7, Section 180 of the Mississippi Constitution. Given Mississippi law governing corporate formalities, this Court finds that Mr. Abdeen did not manufacture evidence by drafting the Organization Documents after receiving the discovery request from White.

### ii.    Suborning Perjury.

As to the allegations of suborning perjury, the Court finds that none of Plaintiffs' counsel

suborned perjury.  Under intense questioning by counsel for White, each of the deponents testified at some point that they could not state with certainty when the Organizational Documents were signed, but they knew they were prepared by Plaintiffs' counsel, Mr. Abdeen.

White seems to think that Plaintiffs' counsel should have come forward with some disclosure as to the actual date of the execution of the Organizational Documents.  The point is without merit. As previously stated, Mississippi law allows for the creation and execution of organizational documents after the formation of a corporation and also allows for those documents to be made effective retroactively as of the date of incorporation.

Additionally, White made no request for information regarding creation and execution of the Organizational Documents in written discovery.  Had he done so, Plaintiffs would have been obligated to respond pursuant to Bankruptcy Rules 7026 and 7033.  However, Mr. Banks first asked about the date of execution of the Organization Documents at depositions when Mr. Abdeen, the drafter of the Organization Documents, was not present.  This Court finds credible the explanation of Plaintiffs' counsel, Mr. Pickering and Mr. Smith, that since they were brought in to the litigation soon before the Trial, they did not know when the Organizational Documents were drafted or executed and that those questions should be directed to Mr. Abdeen.  Importantly, Mr. Abdeen did respond to these accusations before the conclusion of these depositions.

In summary, this Court finds that Heigle did not commit fraud regarding the financial ability of Bayou Louie and Arkla Miss to perform under the contracts.  Based on the Judgment on the Pleadings (Adv. Dk. No. 166) agreed to by White and entered by this Court, the Court also finds that White has no claims regarding any transfers of assets to Rebecca Heigle.  Finally, the Court finds that counsel for Plaintiffs neither manufactured evidence nor suborned perjury.  As such, White's Motion to Strike is not well taken and should be denied.

**Conclusion**

Based on the foregoing, the Court find that White's Counterclaim/Third-Party Complaint, Motion for Summary Judgment, and Motion to Strike are not well taken and are denied.[16] Additionally, the Court finds that Focus Bank has the priority lien on the Winter Wheat Crop.

The Court further finds that the Plaintiffs' Amended Complaint is well taken in part and is granted as follows:

A.      Plaintiffs are granted a judgment compelling specific performance of the contractual obligations owed by White to sell Plaintiffs the Farm;

B.      Plaintiffs are granted a judgment providing that White shall not collect any interest on the purchase price of the Farm that would have accrued under the Purchase Agreement subsequent to May 17, 2007;

C.       Plaintiffs are denied a judgment for crop loss damages from White;

D.      With respect to the potential recovery of attorneys' fees and expenses, Plaintiffs shall make an application by motion detailing the damages they seek by January 23, 2009.  The Court will conduct a hearing during which Plaintiffs must show that the damages they seek meet the appropriate criteria and are recoverable under Paragraph 20 of the Purchase Agreement or applicable law; and,

E.      With respect to the potential recovery of the lenders' attorneys' fees and expenses, Plaintiffs shall make application by motion detailing the damages they seek by January 23, 2009. The Court will conduct a hearing during which Plaintiffs will have to show that the damages they seek meet the appropriate criteria and are recoverable under the various agreements or applicable law.

---

[16]The Court finds it unnecessary to address the remaining arguments raised by White.  In the Court's opinion, White breached the contract for the reasons set forth herein.

A separate final judgment consistent with this Memorandum Opinion and Order will be entered by this Court in accordance with Bankruptcy Rules 7054 and 9021 after the hearing on attorneys' fees as described herein.  Notice of such hearing will be issued contemporaneous with this Memorandum Opinion and Order.

IT IS, THEREFORE, ORDERED, that the relief is granted as set forth herein.

SO ORDERED,